Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Lead Counsel for Plaintiffs and Class

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| In re PAYPAL HOLDINGS, INC. SECURITIES LITIGATION | ) ) ) ) ) ) ) ) ) ) | Master File No. 3:16-cv-07371-RS<br><br>**AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

Lead Plaintiff Tianxiong Jiang ("Plaintiff") individually and on behalf of all the other persons similarly situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by PayPal Holdings, Inc. ("PayPal" or the "Company") and PayPal's former parent company eBay Inc. ("eBay"), as well as conference call transcripts and media and analyst reports about PayPal and eBay, news articles, and information readily obtainable on the Internet, as well as emails and screenshots obtained through a Freedom of Information Act Request from the office of the Texas Attorney General. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired PayPal securities on the open market between July 20, 2015 and April 28, 2016, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78 *et seq*., against PayPal, and certain of their top officials.

2. PayPal was founded in 1998 and is headquartered in San Jose, California. The Company conducted its initial public offering ("IPO") in 2002 and was acquired by eBay later that same year. PayPal was spun off from eBay in July 2015. The Company operates a technology platform that enables digital and mobile payments on behalf of consumers and merchants worldwide. It developed and sells a range of payment solutions that enable businesses of various sizes to accept payments from merchant w*ebsite*s, mobile devices, and applications, as well as at offline retail locations. The Company's platform allows customers to

pay and get paid, transfer and withdraw funds to their bank accounts, and hold balances in their PayPal accounts in various currencies.

3. Venmo is a popular mobile peer to peer ("P2P") mobile payment application that has enjoyed surging popularity amongst millennials by combining an easy-to-use mobile payment processing application combined with a social-media-like timeline component. Venmo describes itself as a "digital wallet" in that it allows its users to transfer money to another party after providing Venmo with personal and bank account information necessary to create a user account.

4. Each quarter, during the Class Period, Venmo materially expanded its dollar volume of transactions. PayPal acquired Venmo in 2013 when it purchased the payment service provider Braintree, which owned Venmo. For the fourth quarter of 2016, Venmo processed $5.6 billion in payment volume, a 126% increase year over year. In December 2016, Venmo crossed the $2 billion total payment volume threshold in a single month for the first time. As a benchmark, it was only earlier in 2016 that Venmo crossed the $1 billion payment volume threshold in a single month for the first time. In the first quarter of 2017, Venmo processed $6.8 billion of PayPal's $99 billion total payment volume, more than double the $3.2 billion that the app processed in the first quarter of 2016. Venmo's social networking features set it apart from other PayPal products, providing PayPal with visibility, market share, and goodwill in this important demographic.

5. PayPal and Venmo currently dominate the mobile payments industry. Because Venmo is the top choice for person-to-person ("P2P") payments, its widespread use means social pressure aids in its further adoption among certain demographics, such as millennials.

6. PayPal is currently working on various ways to monetize Venmo's user base. This approach has been lauded by analysts. Recognizing that Venmo's brand name and recognition are highly valuable, PayPal has invested in expanding Venmo. In the first half of 2016, it expanded Venmo's capabilities, allowing merchants, whether for food, goods, or services (such as concert tickets) to accept Venmo as payment either online or in-app in exchange for a fee. J.P. Morgan analysts writing on October 29, 2015, saw the monetization

trial at the end of 2015 as a potential to "turn a popular zero-calorie product to a high-margin funding option." As of July 26, 2016, Venmo reported on its company blog that all Venmo users could make purchases with Venmo.

7. However, Venmo, and PayPal as a whole, have recurrent issues centering around customer privacy, the use of customer data, and screening of transactions, resulting from a formerly weak compliance, legal, and control system that the Company's Chief Business Affairs and Legal Officer has admitted was inadequate and weak. These issues affected PayPal and Venmo throughout the Class Period.

8. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) PayPal's Venmo service was engaged in unfair trade practices and had a track record of weak compliance and internal controls; (ii) the foregoing facts, when they became known, were likely to subject the Company to increased regulatory scrutiny and/or affect the profitability of PayPal's Venmo service; and (iii) as a result of the foregoing, PayPal's public statements were materially false and misleading at all relevant times.

9. During the Class Period, PayPal failed to disclose that, as a direct result of its inadequate compliance environment, it was the subject of public investigations that would result in Civil Investigative Demands ("CID"), fines, and penalties. When they disclosed an Federal Trade Commission ("FTC") CID on April 28, 2016 which was investigating whether PayPal, through Venmo, was engaged in deceptive or unfair practices in violation of the Federal Trade Commission Act, PayPal's share price fell $0.89, or 2.22%, to close at $39.18 on April 29, 2016.

10. On May 20, 2016, Texas Attorney General Ken Paxton announced a settlement with PayPal regarding Venmo, pursuant to an investigation for potential violations of the Texas Deceptive Trade Practices Act (DTPA). The Consumer Protection Division of the Texas Attorney General's office found a number of issues regarding the safety and security of the Venmo app. According to investigators, Venmo used consumers' phone contacts without clearly disclosing how the contacts would be used, did not clearly disclose how consumers' transactions and interactions with other users would be shared, and misrepresented that

communications from Venmo were actually from particular Venmo users. The Texas Attorney General's office found that as a result, consumers may have exposed private information regarding their payments. PayPal agreed to improve Venmo disclosures to consumers regarding privacy and security, and to better inform users of the safeguards available on its application, and ensure consumers understand who will be able to view their transaction information.

11. As a result of Defendants' false and/or misleading statements, PayPal securities traded at inflated prices during the Class Period. However, after disclosure of Defendants' false and/or misleading statements, PayPal's stock dropped in market value, thereby causing losses and damages to Plaintiff and other Class members.

## JURISDICTION AND VENUE

12. Jurisdiction is conferred by 28 U.S.C. §1331 and §27 of the 1934 Act. The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

13. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b), because PayPal is headquartered in this Judicial District and many of the acts and practices complained of herein occurred in substantial part in this Judicial District.

14. Plaintiff purchased or otherwise acquired PayPal common stock as described in the attached verification and was damaged by the conduct alleged herein.

15. Defendant PayPal is incorporated in Delaware and trades on the NASDAQ under the ticker symbol "PYPL". The Company's corporate headquarters are located at 2211 North First Street, San Jose, California 95035.

16. Defendant Daniel H. Schulman ("Schulman") has served as President and Chief Executive Officer of PayPal since July 2015. He had served as the President and CEO-Designee of PayPal from September 2014 until July 2015.

17. Defendant John D. Rainey ("Rainey") has served as Executive Vice President, Chief Financial Officer ("CFO") of PayPal since September 2016 and Senior Vice President, CFO of Paypal since August 2015.

18. Defendant Patrick L.A. Dupuis ("Dupuis") served as interim CFO of PayPal from July 2015 until August 2015.

19. The Defendants named in ¶¶ 16-18 are referred to herein as the "Individual Defendants."

**SUBSTANTIVE ALLEGATIONS**

20. PayPal's technology platform enables digital and mobile payments on behalf of consumers and merchants worldwide. It permits businesses of various sizes to accept payments from merchant Websites, mobile devices, and applications, as well as at offline retail locations through a range of payment solutions. The Company's platform allows customers to pay and get paid, transfer and withdraw funds to their bank accounts, and hold balances in their PayPal accounts in various currencies.

21. Between 2002 and 2015, PayPal operated as a subsidiary of eBay. eBay is a multinational e-commerce company providing consumer-to-consumer and business-to-consumer payment solutions via the Internet. eBay was founded in 1995 and is headquartered in San Jose, California. The Company's stock trades on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "EBAY".

22. On September 30, 2014, eBay announced that it would spin off PayPal and its services, including Venmo, into a separate publicly traded company. In July 2015, the companies completed the spin-off, pursuant to which each holder of eBay common stock as of the close of business on July 8, 2015 received one share of PayPal common stock for every one share of eBay common stock held. On or about July 20, 2015, PayPal stock began trading again on the NASDAQ under the ticker symbol "PYPL".

23. Venmo's two founders, Iqram Magdon-Ismail and Andrew Kortina, launched Venmo in 2009, initially as a text-message site that allowed files to be exchanged. They revamped Venmo to send and receive payments between account holders via the mobile phone app.

24. In 2012, Braintree paid $26.2 million for Venmo. At the time, Braintree had transformed from a credit card payments processor to a payment gateway company, offering

merchant account processing, credit card storage, recurring billing, support for international and mobile payments, and PCI compliance solutions, and had acquired more than 3,000 e-commerce clients, including Uber and Airbnb. At that time, Venmo was processing a monthly payment volume of about $10 million. Volume was growing at 30 percent per month, and was expected to reach $250 million annually by the end of 2012.

25. In 2013, PayPal (then a unit of eBay) acquired Braintree for $800 million in cash. PayPal provided 40 percent of eBay's revenue at that time. Through Braintree's Venmo app, PayPal had access to a platform for making payments as well as a social user interface – when a Venmo user makes a transaction, the details (minus amount) are shared on the user's news feed and friend network, if the user permits. Braintree stood to benefit from eBay's corporate infrastructure and its data security experience. In July 2015, eBay spun off PayPal (which included Braintree and Venmo) into its own company by distributing one share of PayPal common stock per eBay share. The value of the spinoff was put at $47 billion.

26. For the third quarter of 2016, Venmo processed $4.9 billion of total payment volume, up 131 percent from a year earlier. This growth continued for the next two quarters. For the fourth quarter of 2016, Venmo processed $5.6 billion in payment volume, a 126% increase year over year. In December 2016, Venmo crossed the $2 billion total payment volume threshold in a single month for the first time. As a benchmark, Venmo only crossed the $1 billion threshold in a single month for the first time earlier in 2016. In the first quarter of 2017, Venmo processed $6.8 billion of PayPal's $99 billion total payment volume, more than double the $3.2 billion that the app processed in the first quarter of 2016.

27. Recognizing that its brand name and recognition are valuable to PayPal's business and marketing strategies, PayPal has invested in expanding Venmo. In the first half of 2016, it expanded Venmo's capabilities, allowing merchants to accept Venmo as payment either online or in-app.

28. Venmo and PayPal currently are the top two most downloaded applications in the mobile payments industry. Venmo's deep penetration into millennial consumers has ensured its future as a leader in this industry, as its common use is exactly what makes it the top choice

for many users: because Venmo is used for P2P payments, its widespread use creates social pressure for adoption. In the first quarter of 2017, Venmo processed $6.8 billion of PayPal's $99 billion total payment volume, more than double the $3.2 billion that the app processed in the first quarter of 2016.

29. A May 11, 2016 report by J.P. Morgan described Venmo as a "popular social P2P app used by millennials at a run rate of $1B per month." J.P. Morgan notes that while bank P2P offerings continue to grow, the social aspect of Venmo "differentiate[s] it from the pack." Indeed, while Apple and Google also offer mobile payments, Venmo's social networking feature sets it apart: the product has hit upon a combination of payments and social media that resonates strongly with millennial users.

30. PayPal has developed ways to monetize Venmo as the platform has continued to grow and gain users. PayPal launched a program through which customers can use Venmo to pay for food delivery and ticket vendors, among other popular services used by Venmo's target audience, in exchange for a fee. PayPal is counting on this shift to further expand PayPal's appeal to millennials, who already widely use Venmo to make payments among friends and would likely welcome additional opportunities to use it as a convenient method of payment.

31. Despite PayPal's statements about strong internal controls, both it and its Venmo business unit had a history of violations of regulations and state and federal laws stemming from a weak or missing compliance function throughout the Class Period. PayPal also failed to disclose some of these settlements with government regulators in its quarterly and yearly filings.

32. An April 18, 2017 FastCompany article reported that once Venmo became part of PayPal in 2013, it "plugged into PayPal's compliance infrastructure." Venmo had launched with "virtually no regulatory compliance built into it" despite being legally required to prevent money laundering and fraud as a money transmitter. Defendants intimated that integrating into Braintree and then PayPal enabled Venmo to apply an adequate compliance infrastructure.

33. On October 18, 2013, eBay filed its 10-Q in which it disclosed that on August 7, 2013, eBay received a CID from the CFPB requesting the company "produce documents relating to the … operation of [PayPal's] Bill Me Later business, including its products and

services, advertising, loan origination, customer acquisition, servicing and debt collection." The CID focused on concerns that eBay, through its subsidiary, PayPal's Bill Me Later service, imposed excessive financing costs charged through deferred interest. The service allowed consumers to finance online purchases from major retailers. After its spinoff, PayPal settled with the CFPB in May 2015 by changing its disclosures to customers and paying $25 million in penalties.

34. On December 19, 2013, eBay issued a press release entitled "eBay Inc. Completes Acquisition of Global Payments Innovator Braintree." In the press release, eBay announced the completion of its September 26, 2013 acquisition of Braintree, a global payment platform specializing in servicing leading online and mobile-first startups such as Airbnb, OpenTable, and Uber, for approximately $800 million in cash. In the press release, eBay stated: "PayPal plans to integrate with Braintree only in ways that will benefit customers and support Braintree's growth." eBay further stated: "***Venmo, Braintree's mobile application that gives people an easy way to pay each other using their mobile devices and leveraging social networks, is part of the acquisition and will remain a separate app***." (emphasis added.)

35. On January 31, 2014, eBay filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2013 (the "2013 10-K"). In its 2013 10-K, eBay stated, with respect to Venmo's compliance with applicable laws and regulations, in part:

> To date, PayPal has obtained licenses to operate as a money transmitter (or its equivalent), in 47 U.S. states, the District of Columbia, Puerto Rico and the U.S. Virgin Islands. PayPal is also licensed as an escrow agent in one U.S. state. The two remaining U.S. states where PayPal has not applied for a license do not currently regulate money transmitters. Braintree's subsidiary Venmo provides its peer-to-peer payment service as an agent of an unaffiliated money transmitter, PreCash, but Venmo is also licensed as a money transmitter in California, has applied for a license in Hawaii, and may need to obtain additional state licenses. ***As licensed money transmitters, PayPal and Venmo are subject to restrictions on its investment of customer funds, reporting requirements, bonding requirements, and inspection by state regulatory agencies. If PayPal or Venmo were found to be in violation of money services laws or regulations, PayPal or Venmo could be subject to liability and/or additional restrictions, forced to cease doing business with residents of certain states, forced to change its business practices, or required to obtain additional licenses or regulatory approvals that could impose a substantial cost on PayPal or Venmo.*** Any change to PayPal's business practices that

> makes the service less attractive to customers or prohibits its use by residents of a particular jurisdiction could also decrease the velocity of trade on eBay and websites operated by Enterprise clients that accept PayPal as a form of payment, which would further harm our business. (emphasis added.)

36. On May 1, 2014, eBay filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2014 (the "Q1 2014 10-Q").

37. With respect to Venmo's compliance with applicable laws and regulations, eBay stated:

> To date, PayPal has obtained licenses to operate as a money transmitter (or its equivalent), in 47 U.S. states, the District of Columbia, Puerto Rico and the U.S. Virgin Islands. PayPal is also licensed as an escrow agent in one U.S. state. The two remaining U.S. states where PayPal has not applied for a license do not currently regulate money transmitters. PayPal's subsidiary Venmo, which was acquired as part of the Braintree acquisition, provides its peer-to-peer payment service as an agent of an unaffiliated money transmitter, PreCash. Venmo is also licensed as a money transmitter in California and Washingon, has applied for a license in Hawaii and may need to obtain additional state licenses. ***As licensed money transmitters, PayPal and Venmo are subject to restrictions on their investment of customer funds, reporting requirements, bonding requirements and inspection by state regulatory agencies. If PayPal or Venmo were found to be in violation of money services laws or regulations, PayPal or Venmo could be subject to liability and/or additional restrictions, forced to cease doing business with residents of certain states, forced to change its business practices or required to obtain additional licenses or regulatory approvals that could impose a substantial cost on PayPal or Venmo.*** Any change to PayPal's business practices that makes the service less attractive to customers or prohibits its use by residents of a particular jurisdiction could also decrease the velocity of trade on eBay and websites operated by Enterprise clients that accept PayPal as a form of payment, which would further harm our business.. . .
>
> Following the global financial crisis, U.S. federal lawmakers enacted the Dodd-Frank Act overhauling the federal government's oversight of consumer financial products and systemic risk in the U.S. financial system. Although the full effect of the new legislation will be dependent on regulations to be adopted by a number of different agencies (including the Consumer Financial Protection Bureau), ***the general effect of the financial reform law has been, and we expect will continue to be, to require PayPal and Bill Me Later to make additional disclosures to their users and to impose new restrictions on certain of their activities.*** For example, in January 2012, the Consumer Financial Protection Bureau finalized new regulations, required by the Dodd-Frank Act that required PayPal, starting in late October 2013, to provide additional disclosures, error resolution rights and cancellation rights to U.S. consumers who make international remittance payments, which could increase

> our costs of processing international payments. ***The Consumer Financial Protection Bureau also launched a complaints portal on its website that allows customers to file complaints against PayPal, Venmo and other money transfer service providers, and publishes information on such complaints.*** These and other new obligations will impose new compliance requirements and obligations on us that could increase our costs, may result in increased litigation and the need to make expensive product changes and may otherwise adversely impact our business. (emphasis added.)

38. On July 18, 2014, eBay filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2014 (the "Q2 2014 10-Q"). With respect to Venmo's compliance with applicable laws and regulations, eBay merely stated, in part:

> To date, PayPal has obtained licenses to operate as a money transmitter (or its equivalent), in 47 U.S. states, the District of Columbia, Puerto Rico and the U.S. Virgin Islands. PayPal is also licensed as an escrow agent in one U.S. state. The two remaining U.S. states where PayPal has not applied for a license do not currently regulate money transmitters. PayPal's subsidiary Venmo, which was acquired as part of the Braintree acquisition, provides its peer-to-peer payment service as an agent of an unaffiliated money transmitter, PreCash. Venmo is also licensed as a money transmitter in California and Washington, has applied for a license in Hawaii and may need to obtain additional state licenses. As licensed money transmitters, PayPal and Venmo are subject to restrictions on their investment of customer funds, reporting requirements, bonding requirements and inspection by state regulatory agencies. ***If PayPal or Venmo were found to be in violation of money services laws or regulations, PayPal or Venmo could be subject to liability and/or additional restrictions, forced to cease doing business with residents of certain states, forced to change its business practices or required to obtain additional licenses or regulatory approvals that could impose a substantial cost on PayPal or Venmo.*** Any change to PayPal's business practices that makes the service less attractive to customers or prohibits its use by residents of a particular jurisdiction could also decrease the velocity of trade on eBay and websites operated by Enterprise clients that accept PayPal as a form of payment, which would further harm our business.
>
> . . .
>
> Following the global financial crisis, U.S. federal lawmakers enacted the Dodd-Frank Act overhauling the federal government's oversight of consumer financial products and systemic risk in the U.S. financial system. Although the full effect of the new legislation will be dependent on regulations to be adopted by a number of different agencies (including the Consumer Financial Protection Bureau), ***the general effect of the financial reform law has been, and we expect will continue to be, to require PayPal and Bill Me Later to make additional disclosures to their users and to impose new restrictions on certain of their activities.*** For example, in January 2012, the Consumer Financial Protection Bureau finalized new regulations, required by the Dodd-Frank Act that required PayPal, starting in late October 2013, to provide additional disclosures, error resolution rights and cancellation rights to U.S. consumers who make international remittance payments, which could increase our costs of processing international

> payments. ***The Consumer Financial Protection Bureau also launched a complaints portal on its website that allows customers to file complaints against PayPal, Venmo and other money transfer service providers, and publishes information on such complaints.*** These and other new obligations will impose new compliance requirements and obligations on us that could increase our costs, may result in increased litigation and the need to make expensive product changes and may otherwise adversely impact our business. (emphasis added.)

39. On July 21, 2014, the State of California Department of Business Oversight issued a final order ("California Final Order") against Venmo relating to an investigation of Venmo's compliance with the Bank Secrecy Act, Anti-Money Laundering, Office of Foreign Asset Control, and the USA Patriot Act. Venmo was ordered by California regulators to establish companywide best practices and programs around user privacy, security, customer service, and fraud loss management.

40. The California Final Order required that Venmo address more than 20 "unsafe practices" including a "lack of a customer service policy" and a complete absence of a "compliance system for active suspicious activity monitoring." Venmo was required to "establish vital company policies" around such areas as "consumer privacy (including California Information Privacy Act), information technology, operations, internal controls, and ACH and fraud loss management."

41. On October 16, 2014, eBay filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2014 (the "Q3 2014 10-Q").

42. In the Q3 2014 10-Q, with respect to Venmo's compliance with applicable laws and regulations, eBay stated, in part:

> To date, PayPal has obtained licenses to operate as a money transmitter (or its equivalent), in 47 U.S. states, the District of Columbia, Puerto Rico and the U.S. Virgin Islands. PayPal is also licensed as an escrow agent in one U.S. state. The two remaining U.S. states where PayPal has not applied for a license do not currently regulate money transmitters. PayPal's subsidiary Venmo, which was acquired as part of the Braintree acquisition, provides its peer-to-peer payment service as an agent of PayPal, Inc.. Venmo is also licensed as a money transmitter in California, Vermont and Washington and has applied for a license in Hawaii and may need to obtain additional state licenses. As licensed money transmitters, PayPal and Venmo are subject to restrictions on their investment of customer funds, reporting requirements, bonding requirements and inspection by state regulatory agencies. ***If PayPal or Venmo were found to be in***

> ***violation of money services laws or regulations, PayPal or Venmo could be subject to liability and/or additional restrictions, forced to cease doing business with residents of certain states, forced to change its business practices or required to obtain additional licenses or regulatory approvals that could impose a substantial cost on PayPal or Venmo.*** Any change to PayPal's business practices that makes the service less attractive to customers or prohibits its use by residents of a particular jurisdiction could also decrease the velocity of trade on eBay and websites operated by Enterprise clients that accept PayPal as a form of payment, which would further harm our business.
>
> . . .
>
> Following the global financial crisis, U.S. federal lawmakers enacted the Dodd-Frank Act overhauling the federal government's oversight of consumer financial products and systemic risk in the U.S. financial system. Although the full effect of the new legislation will be dependent on regulations to be adopted by a number of different agencies (including the Consumer Financial Protection Bureau, or CFPB), ***the general effect of the financial reform law has been, and we expect will continue to be, to require PayPal and PayPal Credit to make additional disclosures to their users and to impose new restrictions on certain of their activities***. For example, in January 2012, the CFPB finalized new regulations, required by the Dodd-Frank Act that required PayPal, starting in late October 2013, to provide additional disclosures, error resolution rights and cancellation rights to U.S. consumers who make international remittance payments, which could increase our costs of processing international payments. ***The CFPB also launched a complaints portal on its website that allows customers to file complaints against PayPal, Venmo and other money transfer service providers, and publishes information on such complaints.*** These and other new obligations will impose new compliance requirements and obligations on us that could increase our costs, may result in increased litigation and the need to make expensive product changes and may otherwise adversely impact our business. (emphasis added.)

43. The Q3 2014 10-Q did not mention the California Final Order, nor did it mention any investigation by the California Department of Business Oversight.

44. The Q3 2014 10-Q stated under the section titled "Item 1A: Risk Factors" the following, in part: "Our Payments business is subject to consumer protection laws and regulations in the U.S. and other countries in which it operates. PayPal is focused on compliance with these laws and regulations and has programs designed to comply with new and existing consumer protection requirements. However, any errors, failures or delays in complying with such consumer protection laws and regulations could result in significant criminal and civil lawsuits, penalties, forfeiture of significant assets or other enforcement actions."

45. The Q3 2014 10-Q does not mention the California Final Order.

46. These statements and the certifications filed with the Q3 2014 10-Q were false and misleading because they failed to inform investors of the California Final Order against Venmo.

47. On February 6, 2015, eBay filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2014 (the "2014 10-K"). In the 2014 10-K, with respect to Venmo's compliance with applicable laws and regulations, eBay merely stated, in part:

> PayPal has obtained licenses to operate as a money transmitter (or its equivalent) in the United States, in the states where it is required, and the District of Columbia, the U.S. Virgin Islands and Puerto Rico. PayPal's subsidiary, Venmo, is also licensed as a money transmitter in certain U.S. states. ***As licensed money transmitters, PayPal and Venmo are subject to restrictions on their investment of customer funds, reporting requirements, bonding requirements and inspection by state regulatory agencies. Accordingly, PayPal and Venmo could be subject to liability and/or additional restrictions, forced to cease doing business with residents of certain states, forced to change their business practices or be required to obtain additional licenses or regulatory approvals that could impose substantial cost if they violate these laws or regulations***. (emphasis added.)

48. In the 2014 10-K, eBay stated, in a section titled "Regulation in the areas of consumer privacy and protection of user data":

> We post on our websites our privacy policies and practices concerning the collection, use and disclosure of user data. ***Any failure, or perceived failure, by us to comply with our posted privacy policies or with any regulatory requirements or orders or other federal, state or international privacy or consumer protection-related laws and regulations could result in proceedings or actions against us by governmental entities or others (e.g., class action privacy litigation), subject us to significant penalties and negative publicity, require us to change our business practices, increase our costs and adversely affect our business.*** Data collection, privacy and security have become the subject of increasing public concern. If Internet and mobile users were to reduce their use of our websites, mobile platforms, products, and services as a result of these concerns, our business could be harmed. As noted above, we are also subject to the possibility of security breaches, which themselves may result in a violation of these laws. (emphasis added.)

49. The 2014 10-K does not mention the California Final Order.

50. Venmo told the *New York Times* in a February 27, 2015 article that "Venmo is addressing the concerns that the California Department of Business Oversight brought to our attention and we are complying with their recommendations….To be clear, we take the security

of our customers extremely seriously. We always put them first, and operate accordingly." In the same article, spokesmen for the California regulators commented, "We're continuing to work with Venmo to obtain full compliance with the order."

51. On February 27, 2015, Michael Vaughan, Venmo's general manager, posted an entry on Venmo's company's blog aimed at its users, addressing the security issue, listing "the things we do to help keep you secure," adding that "I want to assure you we are continuously improving product and security measures." The post did not list any specific improvement or safety features that would explicitly affect consumers' phone contacts and did not disclose how Venmo would use its access to consumers' phone contacts or how it would share consumers' transactions and interactions with other users. These were all topics that would later be at issue in the Texas Attorney General's investigation of PayPal and Venmo, and the ensuing settlement reached between the parties, and the Company's description of the CID issued to PayPal by the FTC.

52. On March 23, 2015, PayPal entered into a settlement agreement ("OFAC Settlement Agreement") with the United States Department of the Treasury's Office of Foreign Assets Control (OFAC). The settlement fined PayPal approximately $7.6 million and censured PayPal for not implementing effective compliance procedures and processes to identify and prevent transactions in apparent violation of the sanctions programs run by OFAC. The OFAC Settlement Agreement states that PayPal failed to employ adequate screening technology and processes to identify the potential involvement of U.S. sanctions targets in PayPal-processed transactions and therefore did not screen them in order to reject or block them in accordance with U.S. sanctions program requirements.

53. The OFAC Settlement Agreement states that around March 2006, PayPal identified OFAC-related issues with its payment systems and began to address them. However, it also states that between October 2009 and April 2013, PayPal failed to adequately screen OFAC-prohibited transactions before payment completion.

54. On April 23, 2015, eBay filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 10-Q").

55. In the Q1 2015 10-Q, with respect to Venmo's compliance with applicable laws and regulations, eBay merely stated, in part:

> PayPal has obtained licenses to operate as a money transmitter (or its equivalent) in the United States, in the states where it is required, and the District of Columbia, the U.S. Virgin Islands and Puerto Rico. PayPal's subsidiary, Venmo, is also licensed as a money transmitter in certain U.S. states. ***As licensed money transmitters, PayPal and Venmo are subject to restrictions on their investment of customer funds, reporting requirements, bonding requirements and inspection by state regulatory agencies. Accordingly, PayPal and Venmo could be subject to liability and/or additional restrictions, forced to cease doing business with residents of certain states, forced to change their business practices or be required to obtain additional licenses or regulatory approvals that could impose substantial cost if they violate these laws or regulations***. (emphasis added.)

56. In April 2015, PayPal hired Louise Pentland ("Pentland") as its Chief Business Affairs and Legal Officer. Pentland described the problems hampering the ability of PayPal's legal and compliance functions to be effective controls on the Company prior to her arrival and persisting through April of 2017.

57. In an April 17, 2017 article on Bloomberg Law, Pentland stated that before she joined in April, 2015, PayPal's legal team was "almost like a law firm inside the company. People didn't go to the business team meetings. They weren't on the leadership teams. It was a very strange structure in many ways. People weren't assigned or aligned by business initiatives." Pentland continued, "[i]t's a team of 200 people, so it's not a small team. I immediately aligned people with their primary responsibility, dedicated to their teams and the businesses they supported."

58. In the article, Pentland commented that from April 2015 to April 2017, she made a point to integrate the lawyers in PayPal's 200-person law department into specific business units as she oversaw PayPal's spinoff from eBay, which occurred shortly after she joined. On the internal legal culture at PayPal before Pentland arrived, she commented, "It's easy for lawyers to sit in the background and say, 'Here's the risk, you decide.' Then you think about

how to litigate. But that resulted in what was sometimes, in the worst case, people were lawyer-shopping because they didn't like an answer. There was no accountability."

59. On the compliance function within PayPal, Pentland acknowledged that there was not a robust function. Pentland said "Very early on we realized we really need to… build the compliance function. We hired a chief compliance officer who reported to the CEO…. Doing the right thing means being in line with your regulators. Doing that and building that, it was a lot of work."

60. Pentland stated, "[pre-spinoff from eBay] …my legal team was used to being a subsidiary legal team and we had to step up and elevate our focus of being a $50 billion market cap company. You have to think differently and collaborate differently and focus on paying for good risk-based legal advice. Doing that was challenging and making sure the team develops and becomes business-focused lawyers [were things] I spent time on."

61. In July 2015, eBay completed the spin-off of PayPal into a standalone, publicly traded company. Pursuant to the spin-off, each holder of eBay common stock as of the close of business on July 8, 2015 received one share of PayPal common stock for every one share of eBay common stock held.

**FALSE AND MISLEADING STATEMENTS**

62. The Class Period begins on July 20, 2015, following the completion of eBay's spin-off of PayPal. During the Class Period, PayPal failed to disclose that, as a direct result of its inadequate compliance environment, it was the subject of public investigations by the FTC that would result in penalties and costs to the Company.

63. On July 29, 2015, PayPal filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 10-Q"). In the Q2 2015 10-Q, with respect to Venmo's compliance with applicable laws and regulations, PayPal merely stated, in part: (emphasis added)

> PayPal, Inc. has obtained licenses to operate as a money transmitter (or its equivalent) in the United States, in the states where it is required, and the District of Columbia, the U.S. Virgin Islands and Puerto Rico. Our subsidiary, Venmo, is also licensed as a money transmitter in certain U.S. states. As licensed money transmitters, PayPal and Venmo are subject to restrictions with respect to their investment of customer funds, reporting

> requirements, bonding requirements and inspection by state regulatory agencies. ***Accordingly, we could be subject to liability and/or additional restrictions, forced to cease doing business with residents of certain states, forced to change our business practices or be required to obtain additional licenses or regulatory approvals that could impose substantial cost if we violate these laws or regulations***.

64. The Q2 2015 10-Q also stated, with respect to the CID issued against eBay in 2013 and settled by PayPal in 2015:

> The Consent Order includes obligations on PayPal to $15 million in redress to consumers, a $10 million civil monetary penalty, and requires PayPal to make various changes to our disclosures and business practices. We will continue to cooperate and engage with the CFPB and work to ensure compliance with the Consent Order. ***Violation of the Consent Order could result in claims or actions against us, including litigation, injunctions, or damage awards or require us to change our business practices that could result in a material loss, require significant management time, result in the diversion of significant operational resources or otherwise harm our business***. (emphasis added).

65. On October 29, 2015, PayPal filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 10-Q"). In the Q3 2015 10-Q, with respect to Venmo's compliance with applicable laws and regulations, PayPal merely stated, in part:

> In the United States, PayPal, Inc. has obtained licenses to operate as a money transmitter (or its equivalent) in the states where it is required, as well as in the District of Columbia, the U.S. Virgin Islands and Puerto Rico. Our subsidiary, Venmo, is also licensed as a money transmitter in certain U.S. states, and acts as an authorized delegate and agent of PayPal in the states where Venmo is not directly licensed. ***As licensed money transmitters, PayPal and Venmo are subject to restrictions with respect to their investment of customer funds, reporting requirements, bonding requirements and inspection by state regulatory agencies. Accordingly, if we violate these laws or regulations, we could be subject to liability and/or additional restrictions, forced to cease doing business with residents of certain states, forced to change our business practices or be required to obtain additional licenses or regulatory approvals that could impose substantial costs.*** (emphasis added.)

66. The Q3 2015 10-Q also stated, with respect to the CID issued against eBay in 2013 and settled by PayPal in 2015:

> The Consent Order includes obligations on PayPal to $15 million in redress to consumers, a $10 million civil monetary penalty, and requires PayPal to make various changes to our disclosures and business practices. We will continue to cooperate and engage with the CFPB and work to ensure compliance with the Consent Order. ***Violation of the Consent Order could result in claims or actions against us, including litigation, injunctions, or damage awards or require us to change our business practices that could result in a material loss, require significant management time,***

> ***result in the diversion of significant operational resources or otherwise harm our business. (emphasis added).***

67. On February 11, 2016, PayPal filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2015 (the "2015 10-K").

68. In the 2015 10-K, with respect to Venmo's compliance with applicable laws and regulations, PayPal merely stated, in part:

> In the United States, PayPal, Inc. has obtained licenses to operate as a money transmitter (or its equivalent) in the states where it is required, as well as in the District of Columbia, the U.S. Virgin Islands and Puerto Rico. This license includes not only the PayPal branded products and services in these states, but also our Venmo branded products and services. Our subsidiary, Xoom, is also licensed as a money transmitter in certain U.S. states. As licensed money transmitters, PayPal and Xoom are subject to restrictions with respect to their investment of customer funds, reporting requirements, bonding requirements and inspection by state regulatory agencies. ***Accordingly, if we violate these laws or regulations, we could be subject to liability and/or additional restrictions, forced to cease doing business with residents of certain states, forced to change our business practices or be required to obtain additional licenses or regulatory approvals that could impose substantial costs***. (emphasis added).

69. The 2015 10-K did not disclose anything to do with the Texas Attorney General in the "Litigation and Regulatory Matters" section but did disclose the following regarding OFAC:

> In March 2015, we reached a settlement with OFAC regarding possible violations arising from our practices between 2009 and 2013. In addition, we continue to cooperate with OFAC regarding other transactions that we have self-reported could also possibly be in violation of OFAC sanctions regulations. ***Subsequent to our March 2015 settlement, we have received new subpoenas from OFAC seeking additional information about certain of these transactions.*** Such self-reported transactions could result in claims or actions against us, including litigation, injunctions, damage awards, fines or penalties, or require us to change our business practices that could result in a material loss, require significant management time, result in the diversion of significant operational resources or otherwise harm our business. (emphasis added)

70. In a separate section, the 2015 10-K said the following about the CPFB Consent Order, but omitted the language contained in the Q2 and Q3 2015 10-Q that discussed the consequences of violating the Consent Order:

> In May 2015, we entered into a Stipulated Final Judgment and Consent Order ("Consent Order") with the CFPB in which we settled regulatory claims arising from PayPal Credit practices between 2011 and 2015. The Consent Order included obligations on PayPal to

> pay $15 million in redress to consumers and a $10 million civil monetary penalty, and required PayPal to make various changes to the PayPal Credit disclosures and related business practices. We continue to cooperate and engage with the CFPB and work to ensure compliance with the Consent Order, which may result in us incurring additional costs associated with compliance or redress.

71. The statements referenced in ¶¶ 63-70 were materially false and misleading because Defendants made false and/or misleading statements, and failed to disclose material adverse facts about the Company's business, operational, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) PayPal's Venmo service was engaged in unfair trade practices; (ii) the foregoing facts, when they became known, were likely to subject the Company to increased regulatory scrutiny and/or affect the profitability of PayPal's Venmo service.

## THE TRUTH EMERGES

72. On April 28, 2016, post-market, PayPal filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2016. (the "Q1 2016 10-Q"). In the Q1 2016 10-Q, PayPal stated, that on March 28, 2016, it received a CID from the FTC as part of its investigation to determine whether it through Venmo, engaged in deceptive or unfair practices in violation of the Federal Trade Commission Act, and that "The CID could lead to an enforcement action and/or one or more consent orders, which may result in substantial costs, including legal fees, fines, penalties, and remediation expenses and actions, and could require us to change aspects of the manner in which we operate Venmo."

73. On this news, PayPal's share price fell $0.89, or 2.22%, to close at $39.18 on April 29, 2016.

74. On May 20, 2016, Texas Attorney General Ken Paxton announced a settlement with PayPal regarding Venmo, stating: "The Texas Attorney General's Consumer Protection Division conducted an investigation for potential violations of the Texas Deceptive Trade Practices Act (DTPA) and found a number of issues regarding the safety and security of the Venmo app." From emails obtained by Lead Plaintiff from the Texas Attorney General's office through a Freedom of Information Act ("FOIA") request and attached as exhibits to the

Complaint, the investigation stretches back at least as far as September 2015. *See* Exhibits A and B.

75. According to investigators with the Texas Attorney General's office, Venmo used consumers' phone contacts without clearly disclosing how the contacts would be used, did not clearly disclose how consumers' transactions and interactions with other users would be shared, and misrepresented that communications from Venmo were actually from particular Venmo users.

76. As part of its settlement with the Texas Attorney General, PayPal agreed that its Venmo app would improve disclosures to consumers regarding privacy and security. Paypal also agreed to better inform users of the safeguards available on its app, and ensure consumers understand who will be able to view their transaction information. The settlement also includes a payment of $175,000 to the State of Texas.

77. Emails obtained from the Texas Attorney General's office, appended to this Complaint as exhibits, indicate that after the settlement and announcement wording were finalized with the Texas Attorney General's office, PayPal wanted to "contact" the FTC, the "NY DFS" (presumably the New York State Department of Financial Services), and that the "CFPB is on-site at PayPal" (presumably the Consumer Fraud Protection Board) and the CA DBO (presumably the California Department of Business Oversight). *See* Exhibit B. As noted above, the Q2 and Q3 2015 10-Q stated, with respect to the CFPB CID issued against eBay in 2013 and settled by PayPal in 2015:

> We will continue to cooperate and engage with the CFPB and work to ensure compliance with the Consent Order. ***Violation of the Consent Order could result in claims or actions against us, including litigation, injunctions, or damage awards or require us to change our business practices that could result in a material loss, require significant management time, result in the diversion of significant operational resources or otherwise harm our business***." (emphasis added).

78. As a result of Defendants' false and/or misleading statements, PayPal securities traded at inflated prices during the Class Period. However, after disclosure of Defendants' false and/or misleading statements, PayPal's stock suffered a decline in market value, thereby causing losses and damages to Plaintiff and other Class members.

## CLASS ALLEGATIONS

79. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class, consisting of all those who purchased or otherwise acquired PayPal securities on the open market between July 20, 2015 and April 28, 2016, (the "Class"). Excluded from the Class are Defendants and their family members, directors and officers of PayPal and their families and affiliates.

80. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, PayPal securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by eBay, PayPal or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

81. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a) Whether Defendants violated the 1934 Act;

(b) Whether Defendants omitted and/or misrepresented material facts;

(c) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e) Whether the prices of PayPal securities were artificially inflated; and

(f) The extent of damage sustained by Class members and the appropriate measure of damages.

82. Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from Defendants' wrongful conduct.

83. Plaintiff will adequately protect the interests of the Class and has retained counsel who is experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

84. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## APPLICABILITY OF PRESUMPTION OF RELIANCE FRAUD ON THE MARKET

85. Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) The omissions and misrepresentations were material;

(c) PayPal securities are traded in an efficient market;

(d) The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of PayPal stock; and

(e) Plaintiff and other members of the Class purchased PayPal common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

86. At all relevant times, the market for PayPal’s common stock was efficient for the following reasons, among others:

(a) As a regulated issuer, PayPal filed periodic public reports with the SEC; and

(b) PayPal regularly communicated with public investors via established market communication mediums, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as

communications with the financial press, securities analysts and other similar reporting services. The Individual Defendants had the power and authority to cause PayPal to engage in the wrongful conduct complained of herein. PayPal controlled the Individual Defendants and all of their respective employees. By reason of such conduct, Defendants are liable pursuant to §20(a) of the Exchange Act.

**COUNT I – Violations of Section 10(b) of the Exchange Act**
**and Rule 10b-5 Promulgated Thereunder**
**(Against All Defendants)**

87. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

88. Plaintiff asserts this Count pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, against Defendants.

89. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of PayPal securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire PayPal securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

90. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents

described above, including statements made to securities analysts and the media that were designed to influence the market for PayPal securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Venmo's business practices.

91. By virtue of their respective positions at PayPal, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

92. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of PayPal, the Individual Defendants had knowledge of the details of PayPal's internal affairs.

93. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of PayPal. As officers and/or directors of publicly-held companies, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to PayPal's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of PayPal securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Venmo's business practices which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired PayPal securities at artificially inflated prices and relied upon the price of the

securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

94. During the Class Period, PayPal securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of PayPal securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of PayPal securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of PayPal securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

95. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

96. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

**COUNT II – Violations of Section 20(a) of the Exchange Act**

**(Against the Individual Defendants)**

97. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

98. During the Class Period, the Individual Defendants participated in the operation and management of PayPal, and conducted and participated, directly and indirectly, in the

conduct of PayPal's business affairs. Because of their senior positions, they knew the adverse non-public information about Venmo's business practices.

99. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to PayPal's financial condition and results of operations, and to correct promptly any public statements issued by PayPal which had become materially false or misleading.

100. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which PayPal disseminated in the marketplace during the Class Period concerning PayPal's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause eBay and PayPal to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of PayPal within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of PayPal securities.

101. Each of the Individual Defendants, therefore, acted as a controlling person of PayPal. By reason of their senior management positions and/or being directors of PayPal, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, PayPal to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of PayPal and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

102. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by PayPal.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment as follows:

A. Determining that this action is a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding plaintiff and the members of the Class damages and interest;

C. Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

DATED: May 11, 2017

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Laurence Rosen

Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Lead Counsel for Plaintiffs and Class

**THE ROSEN LAW FIRM, P.A.**
Jacob A. Goldberg, Esq.
Alessandra C. Phillips, Esq.
Leah Heifetz, Esq.
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (215)
Email: aphillips@rosenlegal.com
lheifetz@rosenlegal.com

Lead Counsel for Plaintiffs and Class

**PROOF OF SERVICE**

I, Jacob A. Goldberg, hereby declare under penalty of perjury as follows:

I am the managing attorney of The Rosen Law Firm, P.A., with offices at 355 South Grand Avenue, Suite 2450, Los Angeles, CA 90071. I am over the age of eighteen.

On May 11, 2017, I electronically filed the following **AMENDED COMPLAINT** with the Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel of record.

Executed on May 11, 2017.

/s/ Jacob A. Goldberg, Esq.
Jacob A. Goldberg, Esq.